MELISSA HOLYOAK, First Assistant United States Attorney (#9832)
MARK Y. HIRATA, Assistant United States Attorney (#5087)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

FILED US District Court-UT
APR 01 '26 AM11:38

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> JUSTIN BRADLEY WATKINS, <br><br> Defendant. | **INDICTMENT** <br><br> 21 U.S.C. §§ 331(c) and 333(a)(2) (Receipt in Interstate Commerce and Delivery for Pay Misbranded Drugs with Intent to Defraud or Mislead) <br><br> 18 U.S.C. §§ 2(a) and 2(b) (Aiding and Abetting, Willfully Causing) <br><br> Case: 1:26-cr-00015 <br> Assigned To : Barlow, David <br> Assign. Date : 3/31/2026 |

The Grand Jury charges:

At all times relevant to this Indictment:

**Defendant and His Clinics**

1.      Defendant JUSTIN BRADLEY WATKINS ("WATKINS"), a Utah licensed

Osteopathic physician, was the owner of TruHealth Clinic, LLC ("TruHealth" or the

"Clinic"), a Utah limited liability company, with offices at 2707 North (Parkland

Boulevard) 1600 West, Suite 3, Pleasant View, Utah 84404. WATKINS also worked out

of two other locations, Medical Arts Center Clinic of Brigham City ("Medical Arts"),

984 Medical Drive, Suite 1, Brigham City, Utah 84302, and Full Circle Wellness Center ("Full Circle"), 60 South Main Street, Suite 101, Brigham City, Utah 84302.

2.    TruHealth held a business checking account (ending in 3243) at America First Credit Union ("AFCU"), with WATKINS as a primary signatory.

**Defendant's Scope of Medical Practice**

3.    As an Osteopath, WATKINS had two separate practices, one involving family medicine at Medical Arts and the other involving holistic medicine at TruHealth and Full Circle. WATKINS' holistic practice focused on treatments involving mind and body healing, including administering medical cannabis cards, Ketamine treatments (for depression, anxiety, PTSD, and chronic pain), hormone replacement therapy (for mood swings, low energy levels, sleep difficulties, and disease prevention) and weight loss management.

**Defendant's Treatment of Patients for Hormone Replacement Therapy and Weight Loss Management**

4.    As part of WATKINS' treatment of patients for hormone replacement therapy and weight loss management, WATKINS recommended and provided his patients with peptides. Peptides are short chains of amino acids that serve as building blocks of protein and play crucial roles in many biological processes, including hormone signaling, immune response, and tissue repair. For weight loss specifically, WATKINS recommended and provided patients primarily with Semaglutide, Tirzepatide, Retatrutide, and Cagrilinitide, each intended to influence the brain's satiety centers and

2

regulate appetite, hunger, and blood sugar levels, promoting weight loss and managing Type 2 diabetes. WATKINS also recommended and provided patients with other peptides to treat various conditions, including BPC-157 (chronic pain, inflammation, auto-immune conditions), TB500 (muscle injuries, thyroid conditions, wound healing), Ipamorelin and CJC 1295 (growth hormone releasing hormone, tissue regeneration, muscle recovery), GHK and GHK-Cu (collagen and hair development, wound healing, and auto-immune conditions), and NAD+ (energy/sleep, addiction recovery, cell regeneration).

**The Role of the United States Food and Drug Administration in Drug Regulation**

5.      The United States Food and Drug Administration ("FDA") is the federal agency charged with the responsibility of protecting the health and safety of the American public by enforcing the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* (the "FDCA"). The FDA's responsibilities under the FDCA included regulating the manufacture, labeling, and distribution of all drugs and drug components shipped or received in interstate and foreign commerce. To meet those responsibilities, the FDA enforces statutes which require that drugs bear labels and labeling that enables health care providers and consumers to use them in a safe manner. *Id.* at §§ 352(f) and 353(b)(4)(A).

6.      Under the FDCA, the term "drug" includes articles intended for use in the diagnosis, treatment, or prevention of disease in man; and articles (other than food)

intended to affect the structure of function of the body of man. *Id.* at §§ 321(g)(1)(B) and (C).

7.      Under the FDCA, a "label" is a display or written, printed, or graphic matter upon the immediate container of any article, and "labeling" is all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.  21 U.S.C. §§ 321(k) and (m).

8.      Under the authority of the FDCA, a drug is deemed to be "misbranded" if in "package" form, unless it bears a label containing, among other things, the name and place of business of the manufacturer, packer, or distributor. *Id.* at § 352(b). Under regulations promulgated under the Fair Packaging and Labeling Act, the term "package" means any container or wrapping in which any consumer commodity is enclosed for use in the delivery of that commodity to retail purchasers. 16 C.F.R. § 500.2(2).

**Misbranded Drugs Obtained by Defendant**

9.      From around February 2024 to around April 2025 (the "fraud period"), WATKINS caused and intended to cause an intermediary, J.P., to order peptides over the internet from XCE Peptides ("XCE"), a company believed to be located in China. WATKINS paid J.P. for the XCE peptide orders by check, cash, or Venmo.

10.      The XCE peptides ordered by WATKINS included, among others, Tirzepatide, Semaglutide, Retatrutide, Cagrilinitide, BPC-157, TB500, Ipamorelin, CJC 1295, GHK, GHK-Cu, and NAD+. WATKINS knew each XCE peptide was not FDA-

4

approved, were purportedly from China, and could be purchased from XCE at a deeply discounted price. Moreover, Dr. Watkins knew XCE peptides were not backed by proper, reliable testing and clinical trials.

11.    Each XCE peptide order was shipped from outside the United States to J.P.'s residence and thereafter delivered to WATKINS at TruHealth or picked up by WATKINS. The XCE peptides were sold in kits of 10 – vials (injectable) and/or plastic bottles (oral pill) – and were packaged in boxes which appeared to bear Chinese and English lettering. None of the XCE vials or bottles bore any labels and its contents were identified through different cap colors, which also changed and varied.

12.    For each delivery of XCE peptides received by TruHealth in interstate and foreign commerce, WATKINS generally made and affixed labels to vials and/or bottles before providing them to clinic staff. Although the information on labels varied, none of the labels disclosed the name and place of business of the manufacturer, packer, or distributor.

**Misbranded Drugs Delivered by Defendant to Patients**

13.    After meeting with patients during initial visits, depending on patients' conditions and needs, WATKINS recommended and provided an XCE peptide to use. During these initial visits, WATKINS did not inform patients that the peptides they would be using were not FDA-approved and were from China (or any other foreign country). Over time, WATKINS began using a consent form for peptides, noting the

5

FDA may view the peptides as "unnecessary," and without any reference to the peptides' place of business of the manufacturer, packer, or distributor. Trusting and relying upon WATKINS' medical experience, expertise, and guidance to provide them with cheaper but safe drugs, patients purchased XCE peptides from TruHealth. During the fraud period, WATKINS recommended, provided, and sold XCE peptides to over 200 patients in the above manner.

14.     At times during initial patient visits, WATKINS failed to obtain a comprehensive medical history before recommending and delivering XCE peptides to patients. Additionally, patients often were provided with XCE peptide syringes and vials for self-injection without any careful patient monitoring protocols in place. Patient complaints often went unnoticed unless patients, acting on their own initiative, reached out to TruHealth and Dr. Watkins.

**Defendant's Failed Effort to Conceal the Continued Order, Receipt, and Delivery of Misbranded Drugs to Patients**

15.     In around April 2025, WATKINS met with J.P. and K.P. and explained he needed them to create an "LLC" (limited liability company) to distance the XCE peptides from WATKINS and his medical license. WATKINS explained the LLC would continue to purchase peptides from XCE and sell peptides directly to WATKINS' patients. WATKINS assured J.P. and K.P. there was no problem, everything was above board, but that he was "exposed" because he had a medical license. J.P. and K.P.

6

declined the request and shortly thereafter, J.P. terminated his business relationship with WATKINS.

**COUNTS 1 through 8**
**21 U.S.C. §§ 331(c), 333(a)(2) and 18 U.S.C. § 2**
**(Receipt in Interstate Commerce and Delivery for Pay**
**Misbranded Drugs with Intent to Defraud or Mislead)**

16.     The allegations in paragraphs 1 through 15 above set forth above are incorporated herein by reference.

17.     Beginning in around February 2024, and continuing to around April 2025, including on each date identified below, within the District of Utah and elsewhere,

**JUSTIN BRADLEY WATKINS,**

defendant herein, with the intent to defraud and mislead, received and caused to receive in interstate and foreign commerce misbranded drugs – specifically, Tirzepatide, Semaglutide, Retatrutide, Cagrilinitide, BPC-157, TB500, Ipamorelin, CJC 1295, GHK, GHK-Cu, and NAD+ – that were misbranded within the meaning of 21 U.S.C. § 352(b) in that their labels failed to bear the name and place of business of the manufacturer, packer, or distributor, and delivered and proffered for delivery such drugs for pay or otherwise, and aided and abetted therein, with each act below a separate violation:

| Count | Date (on or about) | XCE Peptides Received and Delivered by Defendant | Patient | Total Cost (Approx.) |
|-------|--------------------|--------------------------------------------------|---------|----------------------|
| 1 | 04/15/2024 | 0.5 mg. (Semaglutide) – 4 shots<br>10 mg. vial (BPC 157) | 1 | $155.00 |
| 2 | 05/14/2024 | 7.5 mg. and 2.5 mg. (Tirzepatide) – 8 shots<br>5 mg. vial (Ipamorelin) | 2 | $380.00 |
| 3 | 06/20/2024 | 5 mg. (Tirzepatide) – 4 shots | 3 | $405.00 |

7

| | | 5 mg. vial (Ipamorelin)<br>500 mg. vial (NAD+)<br>Vial (CJC 1295) | | |
|---|---|---|---|---|
| 4 | 07/11/2024 | 2.5 mg. (Tirzepatide) – 4 shots<br>5 mg. vial (Ipamorelin)<br>90 tablets (BPC 157) | 4 | $295.00 |
| 5 | 08/29/2024 | 1.0 mg. (Semaglutide) – 4 shots<br>5 mg. vial (Ipamorelin)<br>Vial (GHK) | 5 | $260.00 |
| 6 | 09/23/2024 | 5 mg. (Tirzepatide) – 4 shots<br>5 mg.  3 vials (Ipamorelin) | 6 | $310.00 |
| 7 | 10/23/2024 | 30 mg. 2 vials (Tirzepatide)<br>5 mg. vial (Ipamorelin) | 7 | $445.00 |
| 8 | 11/19/2024 | 30 mg. 4 vials (Tirzepatide)<br>5 mg. 2 vials (Ipamorelin) | 8 | $490.00 |

All in violation of 21 U.S.C. §§ 331(c), 333(a)(2), and 18 U.S.C. § 2.

## **NOTICE OF INTENT TO SEEK FORFEITURE**

Pursuant to 18 U.S.C. §§ 982(a)(7) and 24(a)(2), upon conviction of any offense violating 21 U.S.C. § 331, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the scheme to defraud.

The property to be forfeited in this matter includes, but is not limited to:

- A money judgment equal to the value of any property not available for forfeiture as a result of any act or omission of the defendant for one or more of the reasons listed in 21 U.S.C. § 853(p).

//

//

//

8

- Substitute property as allowed by 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p).

A TRUE BILL:

_____
FOREPERSON OF GRAND JURY

MELISSA HOLYOAK
First Assistant United States Attorney

_____
MARK Y. HIRATA
Assistant United States Attorney

9